In re Robert D. LOWRANCE, Debtor.

United States of America, Plaintiff,

v.

Robert D. Lowrance, Defendant.

Bankruptcy No. 03–04843–M.
Adversary No. 03–0225–M.

United States Bankruptcy Court,
N.D. Oklahoma.

Feb. 28, 2005.

Stephen J. Schaeffer, Teresa Dondlinger Trissell, United States Department of Justice, Washington, DC, for Plaintiff.

Ryan J. Assink, Scott P. Kirtley, Riggs, Abney, Neal, Turpen & Orbison, Tulsa, OK, Bob Robinson, H.L.R. Robinson, Inc., Oklahoma City, OK, for Defendant.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Chief Judge.

In the culmination of a battle which has spanned almost ten years, this Court is asked to determine whether tax obligations in excess of five million dollars owed by Robert D. Lowrance ("Defendant" or "Mr. Lowrance") to the United States of America, acting through the Internal Revenue Service ("Plaintiff" or the "IRS") are dischargeable. The IRS contends that Mr. Lowrance has spent the better part of the last decade playing an elaborate game of hide and seek with the IRS, utilizing tools such as multiple bank accounts, numerous corporate entities, and concealed cashier's checks, in an effort to make sure that his money stayed with him instead of being placed in the coffers of the IRS. The IRS also claims that Mr. Lowrance took monies in direct violation of prior orders of this Court as part of his scheme. Mr. Lowrance claims that his actions had nothing to do with any intent to avoid paying taxes, but rather represented a reasonable method of conducting business. He admits spending approximately $700,000 in violation of court orders, but lays responsibility for the same at the feet of his advisors. All in all, a very interesting tale, and one with high stakes.

The matter was tried to the Court on December 2, 2004. The Court received voluminous evidence from the parties. In addition, the pre-trial order submitted in this adversary proceeding contained 130 separate stipulations of fact. Closing argument was submitted in the form of post-trial briefs, with the final submissions made to the Court on February 22, 2005. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Civil Procedure 52 and Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.A. § 1334(b).[1] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a). This is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(I).

## Burden of Proof

The IRS seeks to have the obligations which Mr. Lowrance owes to it declared non-dischargeable under

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2005). All other references to federal statutes and rules are also to West 2005 publications.

§ 523(a)(1)(C) of the Bankruptcy Code.[2] Exceptions to discharge under § 523 are narrowly construed in favor of the debtor.[3] As a general matter, a creditor seeking to except a debt from discharge must prove the debt is non-dischargeable by a preponderance of the evidence.[4] The same rule applies to tax obligations.[5]

## Findings of Fact

Mr. Lowrance is an entrepreneur whose business interests appear to focus upon livestock, commodities, and agricultural real estate. At the time of trial, he was 78 years old and legally blind. Although the debt to the IRS that is at issue here arises from calendar year 1994, the relationship between Mr. Lowrance and the IRS became problematic long before then. Mr. Lowrance failed to fully pay his federal income tax liability when due in 1987, 1989, 1991, and 1993. In March of 1994, the IRS began filing liens against Mr. Lowrance with respect to these unpaid taxes. Through a series of IRS collection efforts (that is to say, tax levies) and some voluntary payments, all of these taxes were ultimately paid.

The same cannot be said for Mr. Lowrance's federal income tax liability for 1994. On October 30, 1995, after receiving two extensions, Mr. Lowrance filed his tax return. That return showed a tax liability of $2,390,074. None of these taxes were paid at the time the return was filed. Prior to the trial of this adversary proceeding, the tax liability of Mr. Lowrance to the IRS was fully litigated before the United States District Court for the Northern District of Oklahoma. On December 17, 2002, that court entered judgment in favor of the IRS and against Mr. Lowrance in the amount of $5,135,046.19. Said judgment is now final and non-appealable.

Mr. Lowrance is also not a stranger to bankruptcy cases. On January 23, 1987, Mr. Lowrance and his business, Lobo Cattle Co., filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the District of Kansas. Mr. Lowrance has stipulated that he filed that bankruptcy to prevent the FDIC from shutting down his cattle operations. Mr. Lowrance did not receive a discharge in the Kansas bankruptcy case, and the case was eventually dismissed with prejudice on August 4, 1988. On August 9, 1996, Mr. Lowrance filed a petition for relief under Chapter 11 with this Court. Said case was docketed as Case No. 96–03124–M (the "First Oklahoma Case"). Mr. Lowrance has stipulated that he filed the First Oklahoma Case in order to prevent the IRS from continuing its collection actions against him. Mr. Lowrance did not receive a discharge in the First Oklahoma

**2.** This section provides that
> a discharge under sections 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> (1) for a tax or customs duty—
> * * * * * *
> (C) with respect to which the debtor made a fraudulent return or willfully attempted to evade or defeat such tax.
> § 523(a)(1)(C).

**3.** *Jones v. Jones (In re Jones)*, 9 F.3d 878, 880 (10th Cir.1993) ("Because the purpose of bankruptcy is to provide the debtor a 'fresh start,' statutory exceptions to discharge have been narrowly limited to those areas in which 'Congress evidently concluded that the creditors' interest in recovering full payment of debts ... outweighed the debtors' interest in a complete fresh start.' ") (quoting *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

**4.** *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Jones*, 9 F.3d at 880.

**5.** *Dalton v. I.R.S. (In re Dalton)*, 77 F.3d 1297, 1300 (10th Cir.1996).

Case. The First Oklahoma Case was dismissed on March 13, 2000.

The First Oklahoma Case was an active one. In that case, the Court authorized the sale of several parcels of real property and stock on which the United States had federal tax liens. As part of the orders approving those sales, Mr. Lowrance was required to segregate the proceeds of those sales and place them in a separate account (the "Segregated Account"). Mr. Lowrance was prohibited from taking any funds out of the Segregated Account, during or after the bankruptcy, without prior court approval with proper notice and opportunity to object to the IRS. In addition, the Court ordered that the federal tax liens attached to the monies in the Segregated Account.[6]

On December 18, 1996, Mr. Lowrance closed a sale of real property known as Palace Addition # 2 in Garden City, Kansas. He received net proceeds of the sale in the amount of $149,405.17 and a note in the amount of $175,000 from Dwight Smith. On January 27, 1997, the IRS filed a motion for temporary order denying use of cash collateral and for expedited hearing. At paragraph 7 of that motion, the IRS asserted that its interest in the cash collateral, including the monthly payments of $2,031.91 on the $175,000 note, was not adequately protected. The IRS' motion to prohibit use of cash collateral was granted by agreement of the parties. Notwithstanding said order, Mr. Lowrance deposited the monthly proceeds of $2,031 from this sale into the debtor-in-possession account instead of the Segregated Account.

Mr. Lowrance took money from the Segregated Account on several occasions. As of January 31, 2000, the Segregated Account had a balance of $984,683.94. This Court orally granted Mr. Lowrance's motion to dismiss the First Oklahoma Case on February 29, 2000, upon condition that the dismissal would not affect its prior orders regarding the sale of assets and that the liens held by the IRS upon the assets of Mr. Lowrance, including the lien upon the Segregated Account, would survive the dismissal of the bankruptcy case. The order dismissing Mr. Lowrance's bankruptcy was signed on March 13, 2000. On March 1, 2000, one day after the Court issued its ruling, and twelve days before this Court signed the order dismissing the First Oklahoma Case, Mr. Lowrance wrote a check for $700,000 out of the Segregated Account, and deposited it into his debtor-in-possession account. On February 29, 2000, the day the Court entered its oral ruling dismissing the First Oklahoma Case, Lowrance wrote 5 checks, numbers 3341 through 3345 worth $664,675 on his debtor-in-possession account. These checks were processed on March 1, 2000. The checks were written to the Bank of Oklahoma to purchase cashier's checks that were made out to his attorneys; his financial assistant, Dale Tacheny; his friend, Bruce Johnson; and the bank holding the mortgage on his home. At trial, Mr. Lowrance admitted that he had made "a mistake" when he took these funds, and testified to his belief that he should not be blamed for the mistake, as he relied upon the advice of others when he took this

---

**6.** For example, the February 13, 1997, Order allowing for the sale of certain real estate expressly provided that the proceeds from the sale of said real estate would be deposited into the Segregated Account, and that Mr. Lowrance "shall not be permitted to withdraw any proceeds therefrom without the express written consent of Equitable [another lienholder] and the IRS, or pursuant to Court order." *See Case No. 96–03124–M, Docket No. 47.* Similar restrictions on the use of sale proceeds are contained in every order authorizing the sale of real property by Mr. Lowrance. *See id., Docket Nos. 130 and 147.* The Court takes judicial notice of these orders on its own motion.

money. The Court is not persuaded, and instead Court believes that Mr. Lowrance knew exactly what he was doing when he emptied his bank accounts before the IRS could take action against him.[7]

Mr. Lowrance also made unusual use of cashier's checks on a regular basis. When Mr. Lowrance would sell an asset and receive payment in the form of a check or cash, he would typically deposit it into a bank account and then withdraw all or most of the money in the form of cashier's checks and/or cash. He would then redeposit the cashier's checks as needed in order to write checks to cover his normal monthly personal and business expenses. Dale Tacheny, the individual hired by Mr. Lowrance to represent him before the IRS, testified that one "good" reason for Mr. Lowrance's practice was because the IRS would otherwise levy on the account. In addition, Ramona Heinrich, the long-time personal secretary for Mr. Lowrance, testified that she was told by Mr. Lowrance that he kept money in the form of cashier's checks to ensure that, in the event the IRS seized the money in his checking accounts, he would have a source of funds for payment of bills. Mr. Lowrance did not keep separate records of his cashier's checks. He typically kept these cashier's checks in his shirt pocket.

In March of 2001, Mr. Lowrance opened a bank account at NBC Bank, which later became Home National Bank (the "NBC Account"). Mr. Lowrance apparently used the NBC Account to reenter the cattle business. According to Ms. Heinrich, the NBC Account was to be kept a "secret" from all individuals, including Mr. Tacheny. Checks to Murray Edwards Livestock worth $378,000 were written on the NBC Account in March and April, 2001, which indicate that the checks were issued for the purchase of livestock. In May, June, and October of 2002, Mr. Lowrance wrote over $35,000 in checks to Premier Cattle Co. with the memo notes relating to lot numbers, numbers of heifers, and percentage of ownership and equity. Mr. Lowrance also used the NBC Account to turn deposited funds into cashier's checks and cash. For example, on September 12, 2001, Mr. Lowrance deposited a check into the NBC Account from the Strong & Strong law firm for $98,115.29, then withdrew $80,000 out in the form of a cashier's check. On July 17, 2002, Mr. Lowrance wrote a check to NBC Bank for $4,000 with the memo line: cash. On October 23, 2002, Mr. Lowrance had a check written out to himself from the NBC Account for $15,000. On November 12, 2002 and December 16, 2002, Mr. Lowrance wrote checks from the NBC Account for $5,000 each, one to himself and one to NBC Bank

---

**7.** Ironically, the IRS opposed dismissal of the First Oklahoma Case unless some restriction was placed upon Mr. Lowrance's ability to access the Segregated Account. Consider the following statement made by counsel for the IRS at the February 29, 2000, hearing:

> The federal tax liens that are currently on file and that would be in full force and effect if the Court were to dismiss would not be perfected as to that cash [in the Segregated Account]. It's just like any bank account; the only way to—the way I understand it the only way to perfect a security interest in cash is to seize the cash, and there—it simply as a matter of fact

could not occur simultaneously with this Court's dismissal of the case in such a way that cash could be protected and subject to our lien in the same protection that we're in now.... Mr. Lowrance, if he were inclined to do so, could as this Court dismisses the case, take that money and dispose of it in any way he sees fit subject to our lien, except that we would have no way to go beyond that to protect ourselves.

*Transcript of Proceedings Held February 29, 2000, in Case No. 96–03124–M, Docket No. 287,* Page 9, Lines 2 through 18. These statements could not have been more prophetic.

with the memo line: Cashier Check. After Mr. Lowrance learned in May of 2003 that the IRS had served writs of garnishment upon many of his debtors, he wrote $41,000 in checks, evidenced by check numbers 1035–1040, on May 28 and 29, 2003, all with the payee Home National Bank and memo lines of cashier's check or cash. As recently as March 31, 2004, Mr. Lowrance took $50,000 out of his Home National Bank account in the form of a cashier's check. This transaction took place the day *after* the Government deposed Mr. Lowrance in this proceeding.

The parties have stipulated that Mr. Lowrance maintains an excessive lifestyle while refusing to pay his federal tax liabilities. The admission is supported by the following stipulated facts:

1. Mr. Lowrance lives in a large house with a swimming pool and claims a rent expense of $2,000 per month.

2. He pays for the maintenance on the swimming pool at his rental house.

3. In November of 1999, Mr. Lowrance paid $8,600 to have this rental house repainted and doors redone.

4. He pays the insurance on the rental house he lives in.

5. Although Mr. Lowrance has not been in the commodities business for at least the past two years, he incurs an expense of $443 per month to "keep posted on the market."

6. Although he has no current business operations, he spends over $600 per month for a secretary and spends $600 per month for office rent.

7. He spends over $400 per month for computers.

8. In March of 2003, Mr. Lowrance paid approximately $2,000 for a 50–inch big screen television.

9. In July of 2000, Mr. Lowrance paid his son, Mark Lowrance, $11,000 for a Ford Explorer.

10. In May of 2001, Mr. Lowrance paid $31,500 for a 2002 Explorer.

Given the admission and the stipulated facts, the Court concludes that Mr. Lowrance engaged in a lavish lifestyle while failing to satisfy his tax obligations.

Some time in 1996, the IRS conducted a seizure of assets at the office and residence of Mr. Lowrance. At the time of the seizure, Mr. Lowrance had a file cabinet in his office. The cabinet was locked. Mr. Lowrance refused to open the cabinet. He also stated to representatives of the IRS that there was no cash on hand in his office at the time of the seizure. The IRS then secured the services of a locksmith and opened the file cabinet, finding more than $136,000 in cash stored therein. This cash was taken by the IRS and applied to Mr. Lowrance's tax liability.[8]

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

 The IRS has brought this action under § 523(a)(1)(C) of the Bankruptcy Code, which provides that

> a discharge under sections 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (1) for a tax or customs duty—
>
> \* \* \* \* \* \*

---

8. *Gov't. Ex. 11,* p. 2, Response to United States' First Request for Admissions, Request No. 5.

(C) with respect to which the debtor made a fraudulent return or willfully attempted to evade or defeat such tax.[9]

The IRS does not claim that Mr. Lowrance filed a fraudulent return; it only claims that Mr. Lowrance has made one or more willful attempts to avoid paying his 1994 federal income tax liability. The United States Court of Appeals for the Tenth Circuit has held that, under this section, "the dishonest debtor who conceals assets to avoid the payment or collection of taxes" should be denied the discharge of those taxes.[10] As it did so, the *Dalton* court quoted the following portion of *Spies v. U.S.*, a 1943 decision of the United States Supreme Court:

> Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner.' By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, *concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.* If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime.[11]

The *Dalton* court found this portion of *Spies* to be "directly on point" in cases involving 523(a)(1)(C).[12] In that same case, the court held that "[a] debtor's actions are willful under § 523(a)(1)(C) if they are done voluntarily, consciously or knowingly, and intentionally."[13] The position taken by the United States Court of Appeals for the Tenth Circuit falls within the mainstream of decisions reached in other circuits.[14]

■ In this case, Mr. Lowrance filed his 1994 tax return showing a liability to the IRS in excess of $2.3 million. He made no efforts to voluntarily pay this debt. Instead:

1. He converted cash and checks into cashier's checks, which he kept on his person until he needed the funds for a purpose other than the pay-

---

9. § 523(a)(1)(C).

10. *Dalton v. I.R.S. (In re Dalton)*, 77 F.3d 1297, 1301 (10th Cir.1996).

11. *Id.* (quoting *Spies v. U.S.*, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943)) (emphasis added). The *Spies* case dealt with a portion of the Internal Revenue Code which made any "willful attempt to evade or defeat a tax" a felony crime. *Spies*, 317 U.S. at 493, 63 S.Ct. 364.

12. *Dalton*, 77 F.3d at 1301.

13. *Id.* at 1302 (citing *Toti v. U.S. (In re Toti)*, 24 F.3d 806, 809 (6th Cir.1994)).

14. *See, e.g., United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1329 (11th Cir.2001) ("The conduct requirement [of § 523(a)(1)(C)] is satisfied ... where a debtor engages in affirmative acts to avoid payment or collection of taxes ..."); *Stamper v. U.S. (In re Gardner)*, 360 F.3d 551, 557–558 (6th Cir.2004); *In re Birkenstock*, 87 F.3d 947, 952 (7th Cir.1996); *see also U.S. v. Beltran*, 316 B.R. 371, 374 (S.D.Fla.2004) (taxpayer acts "willfully" when he pays other creditors while knowing that taxes are due); *Fridrich v. I.R.S. (In re Fridrich)*, 156 B.R. 41, 43 (D.Neb.1993) (same); *Jones v. U.S. (In re Jones)*, 116 B.R. 810, 815 (Bankr.D.Kan.1990) (same).

ment of taxes. He admitted to his secretary that one of the reasons he kept the cashier's checks was to keep money outside the reach of the IRS.

2. When faced with an asset seizure at his office in 1996, he made a false statement to the IRS that there was no cash in his office when, at the time the statement was made, there was over $130,000 in cash in a locked file cabinet at said office.

3. He kept money in the NBC Bank Account while failing to disclose the existence of that account to the person whom he had hired to deal with the IRS regarding his tax liability.

4. In violation of orders of this Court, Mr. Lowrance took $700,000 from the Segregated Account and used the money to pay for items other than his tax obligations. It is worth noting that the orders entered regarding the monies in the Segregated Account were agreed to by Mr. Lowrance, and acknowledged that the IRS had a lien interest in those funds.

5. While a debtor in a Chapter 11 case, he disposed of money from the sale of real estate in violation of court orders and without ever accounting for the same.

This list is intended to be illustrative, not exhaustive.[15] Any one of these factors, standing alone, would justify the conclusion that Mr. Lowrance willfully concealed monies from the IRS in order to avoid payment of his 1994 tax liability. Viewed cumulatively, they are almost overwhelming. The Court concludes that Mr. Lowrance has "voluntarily, consciously, knowingly, and intentionally" attempted to conceal assets from the IRS in order to avoid payment of his 1994 federal income tax liability. As a result, those tax obligations shall not be discharged in this bankruptcy case.

### Conclusion

The obligations of Mr. Lowrance to the IRS for tax year 1994, together with any and all interest, charges, and penalties appurtenant thereto, are not discharged. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

---

**15.** Were the Court to endeavor to catalog all of the acts taken by Mr. Lowrance which could be considered willful, this opinion would become unnecessarily lengthy. The items which the Court has identified are sufficient to support the conclusion reached today.

As other courts have put it, "when a pig becomes a hog, it is slaughtered." *Albuquerque Nat'l Bank v. Zouhar (In re Zouhar)*, 10 B.R. 154, 157 (Bankr.D.N.M.1981); *Norwest Bank Neb., N.A. v. Tveten (In re Tveten)*, 848 F.2d 871, 879 (8th Cir.1988).